**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **CR. No. 06-108S** |
| | ) | |
| **JOSEPH ANTONE, JR.** | ) | |

**GOVERNMENT'S SECOND SUPPLEMENTAL RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO SUPPRESS EVIDENCE AND STATEMENTS**

At the conclusion of the suppression hearing in this matter, the Court asked the parties to brief their closing arguments as well as several issues raised by the Court.

**CREDIBILITY**

The Court should resolve this case in favor of the government because the defendant invited the officers into his apartment; that is, he voluntarily consented to their entry. Even if the Court were to conclude that the defendant's statement, "come on, I've got to get my shoes," while simultaneously opening the door wider and then walking towards the rear of the apartment does not amount to express consent to enter the apartment, the Court should find that it constitutes implied consent[1]. See United States v. Winston, 444 F.3d 115 (2006); United States v. Blais, 98 F.3d 647 (1996).

The two Middletown police officers, Detective William Swierk and Detective Kelly Mitchell, who testified to the defendant's consent, were credible witnesses for a number of reasons. First,

[1] Express and implied consent were briefed in the government's initial response to the defendant's motion to suppress.

both detectives were in a position to see and hear the defendant during the crucial period of time; they were at the front door when the defendant answered their knock. Both detectives demonstrated a clear memory of the events, and their recollections were consistent with each other and with their reports written at or near the time of the events. Despite lengthy cross-examinations, the detectives' testimony did not vary and they were not impeached.

Detective Swierk's and Detective Mitchell's testimony regarding the events was consistent with the other evidence in the case. Detective Mark Matoes, Newport Police Department, testified that the defendant told him that he let the Middletown detectives into his apartment during the unrecorded portion of Detective Matoes' interview with the defendant[2]. (Transcript, Volume 1, p. 101-02). Detective Michael Rego, Newport Police Department, testified that Detective Matoes told him on August 31, 2006 about the defendant's preliminary statement admitting that he let the officers into the apartment the day of the search. (Transcript, Volume 2, p. 41).

Despite the defendant's changed story, the manner in which the recorded interview occurred corroborates Detective Matoes' testimony regarding the defendant's initial statement that he had

---

[2] Detective Matoes testified that the defendant denied allowing the Middletown detectives into his apartment during the recorded portion of Detective Matoes' interview with the defendant that occurred directly after the initial unrecorded portion of the interview.

given consent to the Middletown detectives. During the recorded interview, Detective Matoes asked the defendant twice about letting the Middletown detectives into his apartment. Detective Matoes plausibly explained that he asked the question twice because he was surprised by the defendant's changed answer. (Transcript, Volume 1, pp. 108-09).

While the officers' testimony was credible, consistent, plausible and corroborated, the same cannot be said for the defendant's testimony. First and most obviously, the defendant had a motive to lie, unlike the police officers who lack a personal stake in the outcome. The defendant could potentially spend the rest of his life in prison and thus, he, more so than anyone in the courtroom, has an interest in how the Court resolves the credibility determination confronting it.

Furthermore, the defendant has shown himself to be untrustworthy. He has seven felony convictions and a conviction for obstructing a police officer. The law recognizes that convicted felons are less credible than other witnesses. See Fed.R.Evid. 609.

This is especially true when the witness perjures himself as this defendant did. During the suppression hearing, the Court asked the defendant if he signed the consent to search form for his apartment and the defendant said that he did not. (Transcript, Volume 2, p. 88). He also claimed it was not his

signature at the bottom of the form; however, in his recorded interview with Detective Matoes, the defendant admitted that he did sign the consent to search form. (Government Exhibit 3, p.9). Clearly the defendant was not truthful with the Court.

The defendant called his neighbor, Ms. Baker, to testify about what transpired between the defendant and the Middletown detectives[3]; however, she was not in a position to hear the exchange between the defendant and the detectives. Ms. Baker testified that she was awakened in the early morning hours by the detectives. (Transcript, Volume 2, pp. 65-66). Undoubtably, she was a bit groggy. Despite her testimony that she was only six or seven feet from the defendant's door (Transcript, Volume 2, p. 55), she underestimated this distance since they were separated by part of her apartment, part of a floor and a whole other apartment. (Transcript, Volume 2, pp. 58-60). Ms. Baker testified that the defendant speaks clearly and that she has no trouble understanding him (Transcript, Volume 2, p. 65). This is questionable given the defendant's lack of teeth (Transcript, Volume 2, p. 79), the manner in which he speaks (Transcript, Volume 2, p. 71) and the distance she was from him. In short, the Court should conclude Ms. Baker was mistaken about what she heard.

---

[3] Ms. Baker claimed the defendant said "hold on, I have to get my keys" instead of "come on, I have to get my shoes."

**GOOD FAITH MISTAKE**

The Court raised the issue of the impact upon its analysis of a misunderstanding of the defendant's statements to the Middletown detectives. In other words, even if the defendant really did say, "hold on," instead of "come on," as he opened the door, turned and walked towards his kitchen, but the Middletown detectives heard "come on," the Court queries would the Fourth Amendment require suppression of the evidence subsequently discovered?

"The touchstone of the Fourth Amendment is reasonableness." Florida v. Jimeno, 500 U.S. 248, 250-51 (1991). "The Fourth Amendment does not proscribe all state-initiated searches and seizures; it merely proscribes those which are unreasonable." Id.

While the government is unaware of case law addressing the specific issue raised by the Court, in determining whether police officers received consent from an individual, whether an individual had authority to consent to a search, or what the scope of consent to search was, the courts apply a standard of objective reasonableness. See id. at 251 ("The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness-what would the typical reasonable person have understood by the exchange between the officer and the suspect?"); United States v. Melendez, 301

F.3d 27, 32-33 (1st Cir. 2002) ("[A]n objectively reasonable person would believe that Ms. Melendez consented to the search and that search of the speaker was within the scope of that consent."); United States v. Meada, 408 F.3d 14, 20 (1st Cir. 2005) (concluding it was "objectively reasonable" for the officers to believe the individual had authority to consent).

Similarly, reasonable suspicion based upon a "plausible but mistaken" view of the facts may justify a Terry stop. United States v. Coplin, 463 F.3d 96, 97 (1st Cir. 2006). In reaching this holding, the First Circuit recognized that "deference is due to objectively reasonable perceptions" of police officers. Id. at 101. The Court also distinguished between a mistake of law, which even if reasonable, would not withstand Fourth Amendment scrutiny[4], and a mistake of fact, which would survive constitutional scrutiny "so long as the mistake is objectively reasonable." Id.; see United States v. Fox, 393 F.3d 52, 59 (1st Cir. 2004) (decision vacated on other grounds); United States v. Miguel, 368 F.3d 1150, 1154 (9th Cir. 2004).

Likewise, in the context of a search warrant, the courts have refused to suppress evidence of a search warrant unsupported by probable cause if the officers were acting in good faith. See United States v. Leon, 468 U.S. 897, 926 (1984); United States v.

---

[4] But see United States v. Martin, 411 F.3d 998, 1001-02 (8th Cir. 2005) (refusing to suppress evidence resulting from an objectively reasonable mistake of law).

Capozzi, 347 F.3d 327, 333 (1st Cir. 2003). In creating this exception to the warrant requirement, the Supreme Court reiterated, "'[i]f the purpose of the exclusionary rule is to deter unlawful police conduct, then evidence obtained from a search should be suppressed only if it can be said that the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional under the Fourth Amendment.'" Leon, 468 U.S. at 919 (quoting United States v. Peltier, 422 U.S. 531, 542 (1975)).

The same standard of objective reasonableness used by courts to determine the scope of consent, apparent authority to consent, reasonable suspicion or whether the officer reasonably relied upon a search warrant should be employed in a situation such as the Court hypothesizes in this case. While by no means does the government agree that the defendant was truthful, were the Court to conclude that the Middletown detectives were mistaken as to the defendant's statements, the Court should refuse to suppress the evidence. To suppress the evidence because of a good faith mistake in the context of the facts of this case would fly in the face of the reasoning underlying the exclusionary rule. The defendant's actions in combination with his statements implied invitation. He opened the door further, turned and walked towards the kitchen. Detective Swierk followed the defendant to the kitchen, yet even according to the defendant, he did not do

anything to stop Detective Swierk. (Transcript, Volume 2, pp. 85-87). A good faith mistake on the part of the detectives should not serve as a windfall to the defendant; the suppression motion should be denied.

**ATTENUATION**

Although the government maintains that the Middletown detectives legally entered the defendant's apartment with the defendant's consent, the Court asked the parties to address whether the consent to search subsequently obtained by Detective Mark Matoes was sufficiently attenuated from the Middletown detectives' entry and observations in the defendant's apartment so as to provide an alternative basis for admitting the evidence seized from the apartment. See United States v. Maldonado-Espinosa, 968 F.2d 101, 103-04 (1st Cir. 1991) (denying the suppression motion because the illegal x-ray of the luggage subsequent to a dog sniff played no significant role in obtaining the consent to search luggage); United States v. Navedo-Colon, 996 F.2d 1337, 1339 (1st Cir. 1993) (illegal x-ray of luggage did not significantly influence the defendant's decision to consent to search in light of the dog sniff).

"In addressing whether the connection between a prior illegality and challenged evidence has 'become so attenuated as to dissipate the taint, we take into account 'considerations relating to the exclusionary rule and the constitutional

principles which it is designed to protect.'" United States v. Paradis, 351 F.3d 21, 32 (1st Cir. 2003). The appropriate question is whether the alleged taint of the Middletown detectives' entry dissipated before Detective Matoes obtained the defendant's consent to search. See United States v. Oguns, 921 F.2d 442, 447 (2nd Cir. 1990).

In such a situation, the government must prove the defendant's consent was obtained without exploitation of the allegedly illegal entry[5]. See Wong Sun v. United States, 371 U.S. 471, 487-88 (1963); Oguns, 921 F.2d at 447. To determine whether the government has met its burden, the Court should consider whether Miranda warnings were given, the "'temporal proximity'" of the illegal entry and the consent, "'the presence of intervening circumstances,'" and "'the purpose and flagrancy of the official misconduct.'" Oguns, 921 F.2d at id. (quoting Brown v. Illinois, 422 U.S. 590, 603-04 (1975)).

In this case, the defendant was read his Miranda rights and he waived those rights in writing prior to signing the consent to search form. (Transcript, Volume 1, p. 98; Government Exhibit

[5] Although the analysis under Wong Sun and Brown requires the Court to consider the voluntariness of the defendant's written consent to search, in this case the voluntariness of the defendant's written consent has not been challenged. Should the Court sua sponte consider the issue, the government maintains that the written consent (Government Exhibit 2) corroborated by the defendant's recorded admission that he signed it (Government Exhibit 3, p.9) establish that the defendant voluntarily consented to a search of his apartment by the Newport detectives. Furthermore, although the defendant was in custody at the time, it was not a coercive environment; he was interviewed by only one detective, given a cigarette and offered water or coffee. (Transcript, pp. 11-13).

1). Accordingly, this factor weighs in favor of the Court's finding that the consent to search was attenuated from the allegedly illegal entry.

Additionally, the defendant was provided with a consent to search form that advised him of his right to refuse consent. (Trancript, pp. 99-100; Government Exhibit 2). Thus, the defendant was advised of his Fourth Amendment rights and this "intervening act" also weighs in favor of a finding of attenuation. See Oguns, 921 F.2d at 447-48; but see United States v. Torres, 274 F.Supp.2d 146, 157 (D.R.I. 2003). Moreover, the defendant signed the consent to search form approximately 2 to 2 ½ hours after the allegedly illegal entry, thereby diminishing concern regarding the temporal proximity of the consent to the allegedly illegal entry. (Transcript, Volume 1, pp. 6, 99-100; Government Exhibit 2).

Finally, there is no evidence of flagrant official misconduct. As already discussed, the Middletown detectives were credible witnesses and their testimony proved that the defendant consented to their entry. Even if the Court were to credit the defendant's account of events, it would not establish that the detectives were acting in bad faith. It would merely prove a good faith mistake of fact. Accordingly, the last factor in the Brown analysis supports a finding by the Court that the taint of

the allegedly illegal entry was dissipated before the defendant consented to a search of the apartment.

**INEVITABLE DISCOVERY AND THE SEARCH WARRANT**

The inevitable discovery rule is not applicable in this case because the use of the search warrant was not "truly inevitable." United States v. Silvestri, 787 F.2d 736, 744 (1st Cir. 1986). While there is no requirement in the First Circuit that the warrant application process have already been initiated at the time of the illegal search, see id. at 746, there must still be an objective basis in the record for the Court to conclude that the warrant was not sought because of the evidence illegally obtained. See United States v. Dessesaure, 429 F.3d 359, 369 (1st Cir. 2005).

In this case, while arguably the Newport detectives had probable cause even without the allegedly illegal observations by the Middletown detectives, the allegedly illegal plain view observations were included in the warrant application. There is no objective evidence that the Newport detectives would have sought a warrant without the knowledge of the Middletown detectives' observations. Compare Dessesaure, 429 F.3d at 369 (refusing to suppress evidence because the officer and the defendant testified at the suppression hearing that the police were going to apply for a search warrant prior to the illegal entry).

Despite having received information about the defendant, there is no evidence in this case that the Newport detectives were investigating the defendant. There is also no evidence that the Newport Detectives had any intention of seeking a warrant for the defendant's apartment at any time in the foreseeable future. While the inquiry is an objective one, if Detective Matoes were asked, he would testify that the Newport narcotics detectives did not have plans at that time to obtain a search warrant for the defendant's apartment. Accordingly, the doctrine of inevitable discovery is not applicable under the particular facts of this case.

**CONCLUSION**

For the foregoing reasons and those stated in the Government's previous briefs, the Court should deny the defendant's motion to suppress.

Respectfully submitted,
UNITED STATES OF AMERICA

By its Attorneys,

ROBERT CLARK CORRENTE,
UNITED STATES ATTORNEY

/s/ SANDRA R. BECKNER
SANDRA R. BECKNER
Assistant U. S. Attorney
NY Bar
U.S. Attorney's Office
50 Kennedy Plaza, 8th Floor
Providence, RI 02903
Tel401709-5000/Fax401709-5001
sandra.beckner@usdoj

**CERTIFICATE OF SERVICE**

On February 16, 2007, I caused the Government's Second Supplemental Response in Opposition to Defendant's Motion to Suppress Evidence and Statements to be filed electronically and it is available for viewing and downloading from the ECF system.

Electronic notification:

Mr. Joseph J. Voccola
454 Broadway
Providence, RI 02903
Phone (401) 751-3900
Fax (401) 751-8983
sue@joevoccolalawoffices.com

Mr. John F. Lusi
Law Offices of John F. Lusi
29 Okie Street
Providence, RI 02908
Phone: (401) 632-0161
Fax: (401) 632-0589
jlusi@cox.net

/s/ SANDRA R. BECKNER
SANDRA R. BECKNER
Assistant U. S. Attorney
NY Bar
U.S. Attorney's Office
50 Kennedy Plaza, 8th Floor
Providence, RI 02903
Tel (401) 709-5000
Fax (401) 709-5001
sandra.beckner@usdoj