UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| Plaintiff, | ) | |
| v. | ) | C.A. No. 06-108 S |
| JOSEPH ANTONE, JR., | ) | |
| Defendant. | ) | |

## DECISION AND ORDER

William E. Smith, United States District Judge.

Defendant Joseph Antone moves to suppress over 200 grams of cocaine (both powder and crack) seized by the Middletown and Newport police as well as oral and written statements Antone made to the police. Based on the following findings of fact and conclusions of law, and pursuant to Rule 12(d) of the Federal Rules of Criminal Procedure, the Court will grant the Motion to Suppress.

I.   Background

On August 31, 2006, William Swierk, a detective with the Middletown Police Department, received an early-morning telephone call at his home. The police dispatcher on the other end of the line told Det. Swierk that a patrolman had found a despondent female wandering on Aquidneck Avenue in Middletown; according to the woman, she had been poisoned and raped at the Bay Willows Inn on Bay Avenue (which is not far from Aquidneck). Det. Swierk then

rendezvoused with his partner, Detective Kelly Mitchell, at the Middletown police station, and the two headed off to the Bay Willows Inn.

Three officers were already at the scene when Swierk and Mitchell arrived at about 4 a.m. The detectives were ushered to room seven, where the alleged rape had occurred. The external door was open, revealing a sitting room and, further along, an internal door, which had somehow freed itself from its hinges, leading to the bedroom. From their position in the sitting room, the detectives observed that the bedroom was littered with personal belongings and drug paraphernalia. One of the officers handed Det. Swierk a receipt showing that the room had been rented to Antone. Taking the receipt, Swierk and Mitchell left to find Antone and obtain his consent to search the motel bedroom.[1]

The detectives' testimony does not provide specifics, but it appears that Det. Swierk procured a list of Antone's possible addresses from the Newport police station. The list took the detectives on a not-so-scenic tour of Newport, with stops at Bradford and Chapel Streets, Newport Hospital (to call on the professed rape victim for more information), and finally Marcus Wheatland Boulevard. Not yet dawn, Det. Swierk, with Det. Mitchell beside him, began canvassing Marcus Wheatland. Jane Baker, who occupied unit 72B in a row of townhouse-like apartments, recalled

---

[1] The indictment does not charge Antone with any wrongdoing associated with the motel room.

2

a rousing knock at some point that morning. (Subsequent testimony revealed that it was between 5 and 5:30 a.m.) Although she did not open the door, Ms. Baker told Det. Swierk that he had the wrong address and returned to her bedroom on the second floor. Through an open window, she testified that she heard one of the detectives knock on unit 72C, which was right next-door, with no response. The detectives proceeded to unit 72D (two units away but still part of the same structure). When one of them rapped on the door to unit 72D, Antone answered.

The parties dispute the critical elements of what happened next. Det. Swierk testified that Antone, fully clothed, opened the door about a single body width. Det. Swierk identified himself and Det. Mitchell, both of whom were not in uniform, as Middletown police officers investigating a sexual assault. Det. Mitchell said nothing but proffered her badge as well. Det. Swierk asked Antone if he had rented a room in Middletown the night before. Antone answered affirmatively. Det. Swierk then asked Antone if he would accompany them to the Middletown police station. According to both detectives, Antone agreed to do so and then, simultaneously opening his door further, said "Come on. I have to get my shoes." When Antone began to walk inside, Det. Swierk noticed that Antone was wearing shoes already. Becoming somewhat concerned (Det. Swierk hypothesized that Antone could have been trying to get a gun), Det. Swierk followed Antone into the livingroom area of the apartment

and asked where he was going.  According to Det. Swierk, Antone's response was mumbled, so he followed Antone into the kitchen, where Antone explained that he was getting a pizza out of the microwave. Meanwhile, Det. Mitchell, who entered the apartment with Det. Swierk but remained in the livingroom, spotted what appeared to be cocaine in plain view on the coffee table and television stand. Det. Mitchell pointed to the cocaine when Det. Swierk and Antone emerged from the kitchen.  When asked, Antone admitted that the cocaine was his.  At that point, Antone was told to take a seat on the couch while one of the detectives contacted the Newport Police Department for assistance.  Within a short time, the Newport police arrived, took Antone into custody, and transported him to the Newport police station.

Antone, who took the stand, testified to a different set of facts leading up to the arrest.  After he answered the door, and Det. Swierk gave his spiel, Antone testified that he agreed to go to the police station but said "hold on while I get my keys."  Ms. Baker, eavesdropping from her recessed bedroom window some feet away, confirmed Antone's account; she testified that Antone said "hold on, let me get my keys" (during direct) or "hold on, I need to get my keys" (during cross).  As Antone began to walk toward the kitchen, where he kept his keys, he noticed that both officers had entered the livingroom, prompting him to say "I told you to hold on."  Antone grabbed his keys from the kitchen and hurried back to

4

the livingroom.  When he returned to the livingroom, Antone saw
Det. Mitchell standing over the coffee table pointing at a can with
a piece of plastic protruding from the lid.  Det. Swierk said "No.
Let's go.  We're not here for this," but when Det. Mitchell removed
the lid and found cocaine, Det. Swierk remarked "Now we got to call
the Newport police."  Antone then took a seat on the couch,
admitted the cocaine was his (after Det. Mitchell asked), and was
taken into custody when the Newport police arrived.

The Newport police brought Antone down the street (literally)
to the Newport police station, and placed him in the cell block.
At about 7:30 a.m., Detective Mark Mateos, of the Newport Vice
Narcotics Unit, escorted Antone from the cell block to the
narcotics room, and read him his <u>Miranda</u> rights.  Antone signed a
<u>Miranda</u> form and consented, in writing, to the search of unit 72D.
Antone also agreed to talk with Det. Mateos, who, with Antone's
knowledge and consent, taped and later transcribed the interview.
During the recorded interview, Antone made various confessions but
denied that he gave the Middletown police consent to enter his
apartment.  Det. Mateos testified that the tape, which was played
aloud during the suppression hearing, accurately reflected what
Antone said during the recorded interview; however, he noted that
Antone gave a different response (<u>viz.,</u> that he had, in fact, given
the Middletown police consent to enter his apartment) earlier
during the unrecorded portion of the interview.  Antone denied

5

this, and testified that, other than agreeing to smoke a cigarette, he did not answer any questions before the recording.  Antone also testified that he did not sign the consent-to-search form, or that he was under the mistaken impression that he was consenting to the search of room seven at the Bay Willows Inn.

Later that morning, Det. Mateos, with the assistance of another Newport police detective, obtained a warrant to search unit 72D.  Beyond the cocaine found earlier, the search yielded nearly 200 grams of cocaine, drug ledgers and paraphernalia, video surveillance devices, a police scanner and radio frequency detector, and $3,809 in cash.  During a second interview conducted after the search, Antone confessed to distributing crack cocaine. A federal grand jury indicted Antone on October 4, 2006.

II.  <u>Discussion</u>

The burden of proving that the tangible and testimonial evidence obtained by the Middletown and Newport police was not the product of a Fourth Amendment violation lies with the government. To satisfy its burden, the government posits three separate theories, which the Court will discuss in turn.

A.  <u>Valid Consent</u>

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV.  "At the very core stands the right of a man to retreat into his own

6

home and there be free from unreasonable governmental intrusion." Silverman v. United States, 365 U.S. 505, 511 (1961); see also Welsh v. Wisconsin, 466 U.S. 740, 748 (1984) ("[T]he 'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.'") (quoting United States v. United States District Court, 407 U.S. 297, 313 (1972)). For this reason, a warrantless intrusion into someone's home is presumptively unreasonable under the Fourth Amendment, Payton v. New York, 445 U.S. 573, 589-90 (1980), "subject only to a few specifically established and well-delineated exceptions." Katz v. United States, 389 U.S. 347, 357 (1967).

One such exception is for entries authorized by valid consent. Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973); United States v. Laine, 270 F.3d 71, 74-75 (1st Cir. 2001). When this exception is in play, the government has the burden to prove, by a preponderance of the evidence, United States v. Schaefer, 87 F.3d 562, 569 (1st Cir. 1996), two factbound elements. The first, often referred to as consent-in-fact, United States v. Forbes, 181 F.3d 1, 7 (1st Cir. 1999), requires a showing that consent actually was rendered, whether it be done expressly through oral invitation, see United States v. Miller, 589 F.2d 1117, 1130 (1st Cir. 1978), or impliedly through gesture or conduct, Robbins v. MacKenzie, 364 F.2d 45, 48-49 (1st Cir. 1966). The second typically more controversial element requires a showing that consent was

7

voluntary; that is, "the product of an essentially free and unconstrained choice," United States v. Chhien, 266 F.3d 1, 7 (1st Cir. 2001) (quoting Schneckloth, 412 U.S. at 225), and not "the product of duress or coercion, express or implied," United States v. Luciano, 329 F.3d 1, 7 (1st Cir. 2003) (quoting Schneckloth, 412 U.S. at 227). Voluntariness "turns on an assessment of the totality of the circumstances," United States v. Barnett, 989 F.2d 546, 554-555 (1st Cir. 1993), though several individualized factors (age, education, experience, etc.) and general considerations (whether the consenting party was advised of his or her constitutional rights, for example) channel the inquiry. See United States v. Coraine, 198 F.3d 306, 309 (1st Cir. 1999).[2]

---

[2] A warrantless nonconsensual entry of a residence may also be reasonable under the Fourth Amendment if the government can demonstrate the presence of "exigent circumstances," Warden v. Hayden, 387 U.S. 294, 298-99 (1967), such as, but not limited to, the "imminent threat to the life or safety of members of the public, the police officers, or a person located within the residence." McCabe v. Life-Line Ambulance Serv., Inc., 77 F.3d 540, 545 (1st Cir. 1996). This exception necessarily "turn[s] upon the objective reasonableness of ad hoc, fact-specific assessments contemporaneously made by government agents in light of the developing circumstances at the scene of the search." Id.; see also United States v. Beaudoin, 362 F.3d 60, 67 (1st Cir. 2004), vacated on other grounds by Champagne v. United States, 543 U.S. 1102 (2005) (remarking that the inquiry "is essentially one of reasonable suspicion"). To the extent that the government argues that officer safety justified the entry in this case, that contention is unsupportable and therefore rejected. The government presents no evidence that Swierk and Mitchell, investigating a sexual assault at the time in question, had any reason to believe that Antone was dangerous. Cf. United States v. Sargent, 319 F.3d 4, 10-12 (1st Cir. 2003) (executing a search warrant at an apartment known to contain drugs and weapons); United States v. Bartelho, 71 F.3d 436, 442 (1st Cir. 1995) (responding to a call that a woman was being threatened by a man with a loaded rifle).

The government argues that the testimony of two credible police detectives recounting that Antone said "Come on. I have to get my shoes," is enough to find express consent to enter the apartment, or that Antone's actions (simultaneously opening the door further and walking toward the rear of the apartment), at the very least, constitute implied consent. The government further contends that Antone's consent was voluntary because of the absence of any coercion to gain entry to his apartment. The purpose behind the detectives' visit underscores this point, the government argues, because, at best, Swierk and Mitchell hoped to find Antone and obtain his consent to search the motel room, not ransack (or even enter) his apartment in search of drugs.

After careful consideration of the competing accounts of what Antone said at his doorstep, the Court finds that the government has not satisfied its burden to prove consent-in-fact, and therefore the Court need not reach the question of voluntariness.[3]

---

The only proffered basis for the warrantless intrusion was what Det. Swierk perceived to be an inconsistency on Antone's part about his footwear. But this basis alone did not create an exigent situation such that a reasonable police officer would have feared for his safety. Moreover, an independent review of the record does not reveal any other pertinent information upon which such a belief reasonably may have relied.

[3] The fact that Antone, upon returning from the kitchen, appears to have acquiesced to the police presence is not a substitute for voluntary consent, for it is long settled that the government's "burden cannot be discharged by showing no more than acquiescence to a claim of lawful authority." Bumper v. North Carolina, 391 U.S. 543, 548-49 (1968).

Simply put, the Court credits Antone's account because he was a credible witness with a believable story, and because his neighbor, Ms. Baker, who corroborated the critical segment of his account, was credible as well and appeared to be a disinterested witness. The Court does not make these findings lightly. Antone is after all a convicted felon fighting to stay out of prison for the rest of his life; and, strangely, he testified that he did not sign a consent form that appears to bear his signature.[4] Also, Ms. Baker testified that Antone spoke clearly when -- as was patently obvious to the Court during the hearing — he does not.[5] In spite of these concerns, however, careful inspection of their respective testimony has convinced the Court that, in demeanor and inflection, Antone and Baker told a credible story. Swierk and Mitchell were generally credible as well, but the key difference is that their testimony lacks plausibility while Antone's and Baker's makes sense. See Anderson v. Bessemer City, 470 U.S. 564, 575 (1985)

---

[4] It should be noted that, to this writer's untrained eye, Antone's signature on the consent form does not exactly match his signatures on two other documents in evidence (the room receipt and the Miranda form). But, for whatever reason, defense counsel did not press the issue. As defense counsel's post-hearing memorandum makes clear, Antone's position is that, even if he did sign the consent form, it did not remove the taint associated with the unlawful entry.

[5] Antone has difficulty communicating effectively because he has no teeth. It is odd that Ms. Baker did not readily concede this point, but one possible reason for this may be that, as Antone's neighbor and acquaintance (although she testified that they were not friends), she has less difficulty understanding him than others might have.

10

(observing, in the context of appellate court review for clear
error, that "factors other than demeanor and inflection go into the
decision whether or not to believe a witness.   Documents or
objective evidence may contradict the witness' story; or the story
itself may be so internally inconsistent or implausible on its face
that a reasonable factfinder would not credit it.").

Assuming for the moment that "come on" in these circumstances
has the meaning the government ascribes to it (i.e., an invitation
to enter the apartment as opposed to "you gotta be kidding me"),
Antone's account that he said "hold on" makes far more sense in
light of what he was asked to do.   All parties agree that Det.
Swierk did not ask Antone if they could enter his apartment;
instead, he asked whether Antone would go to the police station
after telling him they were investigating a sexual assault.   To
this request, Antone responded affirmatively.   For Antone, on his
own initiative, to have said "come on" in the sense that he was
inviting the detectives into his apartment in response to the
officer's request strains credulity.   Of course, it is not
impossible that a suspect would prefer to answer questions at home
instead of the police station and so might parry the request to go
to the police station with an invitation to come in and talk.   But
the disconnect here is that Antone agreed to go off to the police
station by saying he had to get his "keys" or "shoes," thus

11

implying that he did not prefer his apartment, or, at least, did not mind going to the police station.

Moreover, Det. Swierk's testimony that Antone said "I have to get my shoes" is inconsistent with the undisputed fact that Antone already was wearing shoes when he answered the door. Also, although the Court's finding hinges on the doorstep exchange, Det. Swierk's testimony about the pizza, while not completely absurd, is at least a bit odd. Even if Antone had a predilection for pre-dawn microwaved pizza, and happened to be preparing one at the very moment Swierk and Mitchell stopped by, it is strange that Antone would not have said so in the first instance in lieu of a cockamamie story about getting his shoes. In other words, the detectives' account bears all the earmarks of a misunderstanding of what was being said. But the fact that Antone was, in the detectives' testimony, speaking nonsense was a signal to stop and clarify, not an excuse to march into the apartment.

In contrast, Ms. Baker corroborated Antone's testimony, with insignificant discrepancy. Although Ms. Baker was several feet away when she overheard the doorstep exchange (during cross-examination, she testified that the distance between her bedroom window and Antone's door was over five but not more than seven feet), she certainly was within earshot. Swierk and Mitchell were much closer, of course, and, it would seem, in a better position to

12

hear what Antone was saying. But their superior vantage point does not make the substance of their testimony any more believable.

Lastly, during the recorded interview with Det. Mateos, Antone twice denied that he gave Swierk and Mitchell consent to enter his apartment. The government posits that the fact that Det. Mateos asked Antone about consent two times could hint at the possibility that Antone's answer during the recording surprised him, presumably because it was different from his answer earlier. But Det. Mateos did not follow up with a question about Antone's conflicting answers, as one would expect if such a situation were true. In an attempt to cure this oversight, the government observes that, at some point after the interview, Det. Mateos mentioned Antone's conflicting answers to another detective, Michael Rego. However, in balance, this does not compare to Antone's recorded denials and Det. Mateos's failure to follow up. Without more, the Court is forced to give little credit to Det. Mateos's testimony that Antone conceded that he had given consent before the tape recorder was turned on.

The consequence of crediting Antone's account is that the center of the government's implied-consent argument cannot hold. Robbins, the primary authority upon which the government relies, does not change this conclusion. There, two police officers, investigating a robbery at a store the night before, knocked on the defendant's apartment door. Robbins, 364 F.2d at 47. Hearing a

13

response from behind the door, an officer identified himself and said that he wished to talk with him. The defendant replied, "Just a minute," opened the door, and walked back into the room. _Id._ Both officers entered and one of them asked the defendant if he would come to the police station for interrogation. The defendant, wearing only an undershirt at the time, began to dress, presumably in preparation for his outing. At that moment, the officers noticed several items in plain view that had been reported stolen from the store. The defendant was arrested, and the items in question seized. The district court found that the search was unlawful. The First Circuit reversed:

> When a householder, knowing the identity and purpose of his caller, opens his door and turns back inside, he expresses by his actions as adequate a consent to entry as he would by a verbal invitation. To be distinguished are cases where the householder opens a door not knowing who is there and finds himself faced with armed authority. In such cases the act of opening the door may merely be to see who is there, and turning back may only be retreating. But a policeman who identifies himself and his purpose from the other side of a closed door has every reason to assume that the act of unlocking and opening the door, without more, is a consent to talk, and that the walking back into the room is an implied invitation to conduct the talking inside.

_Id._ at 48.

Robbins differs from the present case in several respects, two of them critical. The first and most plain in light of the Court's finding above is that, in _Robbins_, the defendant's conduct after he opened the door was accompanied by silence. _See Robbins_, 364 F.2d at 47. The absence of a negative oral response thus permitted the

14

defendant's conduct to imply consent. Here, even though Antone's conduct was nearly identical, his statement, "hold on while I get my keys," is, to the extent that the detectives sought entry in the first place (which they did not), an express repudiation of consent. The statement also serves to explain Antone's subsequent conduct, foreclosing the possibility that he could have implied consent. These are hardly the earmarks of a willing invitor.

The second and more nuanced point is that the police officer in Robbins did not ask the defendant whether he would go to the station until the officers were already inside. The question that prompted the defendant to admit the officers was a solicitation to speak with the defendant, presumably inside the apartment. See Robbins, 364 F.2d at 47. Thus, even though the defendant remained silent, his conduct corresponded with and answered the question posed. See id. However, as discussed above, Det. Swierk did not seek permission to enter Antone's apartment, or, as in Robbins, ask generally whether they could talk. Rather, while still outside, Det. Swierk specifically asked whether Antone would go somewhere else (the police station) and talk. Ignoring Antone's statement for the moment, his conduct alone (without some evidence of trickery on Antone's part) could not have implied an answer to a question he was not asked. Compare Commonwealth v. Rogers, 827 N.E.2d 669, 673-75 (Mass. 2005) (holding in an implied-consent case that a warrantless police entry was unlawful in part because the

15

police did not request entry), <u>and</u> <u>United States v. Shaibu</u>, 920 F.2d 1423, 1427 (9th Cir. 1990) (same), <u>with</u> <u>United States v. Carter</u>, 378 F.3d 584, 588 (6th Cir. 2004) (finding implied consent when defendant stepped back in response to a request to enter), <u>and</u> <u>United States v. Griffin</u>, 530 F.2d 739, 743 (7th Cir. 1976) (same). Moreover, there is a slight but significant difference between "Just a minute" and "hold on." The former is a temporal statement, that is it implies (in answer to the question posed) "I'll be with you in a minute." The latter is the verbal equivalent of a stiff-arm, as in "stay there, I'll be right back." The upshot of all of this is that a police officer who receives a nonsensical answer to a question cannot blithely turn it into an express or implied consent to enter a home when the officer did not even ask to come in; rather, the officer must ask to come in or be invited in and if there is doubt, clarify.

B.   <u>Good Faith Mistake</u>

Notwithstanding the lack of valid consent, the government presses an intriguing alternate argument premised on the fact that the detectives mistakenly (but in good faith) heard Antone say "come on" when he really said "hold on." The government concedes that no authority is directly on point; however, it analogizes similar police mistakes in the context of <u>Terry</u> stops, <u>see</u>, <u>e.g.</u>, <u>United States v. Coplin</u>, 463 F.3d 96 (1st Cir. 2006), third-party consent, <u>see</u>, <u>e.g.</u>, <u>United States v. Meada</u>, 408 F.3d 14, 22 (1st

Cir. 2005), and the good faith exception to the warrant requirement, see, e.g., United States v. Leon, 468 U.S. 897 (1984).[6] Because these cases hold that the mistaken beliefs of the police were objectively reasonable under the circumstances, and thus did not offend the Fourth Amendment, the government argues that suppression is inappropriate here as well.[7]

The government's premise has some superficial appeal. It was obvious from his toothless testimony that Antone does not speak clearly; as the transcript reveals, he was asked to repeat himself

---

[6] The government references two scope-of-consent cases as well, Florida v. Jimeno, 500 U.S. 248, 251 (1991), United States v. Melendez, 301 F.3d 27, 32 (1st Cir. 2002), but apparently does so only to highlight the pervasiveness of the objective reasonableness standard in Fourth Amendment analysis, not to provide another example of how that analysis treats mistakes of fact. There are such examples, see United States v. Marshall, 348 F.3d 281, 286-88 (1st Cir. 2003) (mistaking the defendant's pornographic videotapes for evidence of stolen video equipment, for which consent to search had been obtained), but the analysis is essentially the same as under the rubric of third-party consent.

[7] It is not entirely clear whether the government argues that the entry was lawful because, based on the miscommunication, it was reasonable for Swierk and Mitchell to believe that Antone consented; or, notwithstanding the unlawful entry, that the application of the exclusionary rule — the purpose of which is to deter future police misconduct, not innocent miscommunication — is inappropriate under these circumstances; or both. The government need only succeed on one: a lawful entry (in and of itself) does not violate the Fourth Amendment, and an unlawful entry (absent subsequent wrongdoing) does not necessarily compel suppression. See Leon, 468 U.S. at 905-08; United States v. Conner, 127 F.3d 663, 667 (8th Cir. 1997). However, the Court need not labor on how the government meant to frame the argument because the means by which the government seeks to forestall Antone's motion (no Fourth Amendment violation therefore no suppression versus no suppression in spite of a Fourth Amendment violation) does not much matter in this case. As explained below, both arguments suffer from the same fatal flaw.

several times.   Given the detectives' credibility and the rough proximity of "come on" and "hold on," it is likely that Swierk and Mitchell, not accustomed to hearing Antone speak, simply misheard him.   But Antone's manner of speaking cannot reasonably explain mistaking "shoes" for "keys."   The two sound nothing alike.   And there is nothing to explain Det. Swierk's strange testimony about the presence of a pizza.   This makes the government's premise, which asks the Court to find a mistake of fact only with respect to the most critical moment of the exchange, somewhat harder to stomach.

There are also significant incongruities in the government's analogies.   On a factual level, the closest cases are those involving mistaken police perceptions resulting in a <u>Terry</u> stop. For example, in <u>Coplin</u>, two police officers mistakenly relied upon information from their cruiser's onboard computer about the status of the defendant's license in executing an investigatory stop. <u>Coplin</u>, 463 F.3d at 98.   Similarly, in <u>United States v. Fox</u>, 393 F.3d 52 (1st Cir. 2004), <u>vacated on other grounds</u> 545 U.S. 1125 (2005), a case upon which <u>Coplin</u> heavily relied, a police officer initiated an investigatory stop when he was unable to determine whether the defendant's vehicle had a functioning license plate light, which turned out to be functioning properly.   In both cases, the First Circuit held that "an objectively reasonable suspicion, even if found to be based on an imperfect perception of a given

18

state of affairs, may justify a Terry stop." Coplin, 463 F.3d at 102 (reciting Fox's holding).

However, the occupants of cars enjoy reduced expectations of privacy because cars, unlike homes, are inherently mobile and subject to pervasive regulation. California v. Carney, 471 U.S. 386, 390-92 (1985) (observing that "the ready mobility of the automobile justifies a lesser degree of protection"); South Dakota v. Opperman, 428 U.S. 364, 368 (1976) (reasoning that "[a]utomobiles, unlike homes, are subjected to pervasive and continuing governmental regulation and controls, including periodic inspection and licensing requirements"). A corollary of this dichotomy is that a warrantless examination of a car may be reasonable under circumstances that would not justify a warrantless intrusion of a home. Opperman, 428 U.S. at 367; Cooper v. California, 386 U.S. 58, 59 (1967); see Cardwell v. Lewis, 417 U.S. 583, 589 (1974); Cady v. Dombrowski, 413 U.S. 433, 439 (1973); Chambers v. Maroney, 399 U.S. 42, 48 (1970). This weakens the influence that faulty-perception cases in the context of a Terry stop may bring to bear in the present situation.

The line of third-party consent cases cited by the government is also inapt. First of all, in Meada, the First Circuit did not address whether the consenting party had actual authority; rather, the analysis ended once the court determined that the police reasonably believed it. Meada, 408 F.3d at 22. In other words,

19

the court never said that the police made a mistake of fact.  <u>See</u> <u>id.</u>  The Supreme Court did hold that the police mistakenly relied on the consenting party's representations in <u>Illinois v. Rodriguez</u>, 497 U.S. 177, 182 (1990), the seminal case in this regard. However, in <u>Rodriguez</u>, the mistake was not the result of a miscommunication, as alleged in the present case, but of the police officers' reliance on the consenting party's misrepresentations. <u>See Rodriguez</u>, 497 U.S. at 179-80, 182; <u>see also United States v. Salimonu</u>, 182 F.3d 63, 76 (1st Cir. 1999) (remarking that, in <u>Rodriguez</u>, "the police officers were literally tricked into reasonably believing that the consenting party had actual authority").  The distinction is significant.  A mistake based on faulty perception can be corrected relatively easily through further inquiry (<u>i.e.</u>, "pardon me?"), whereas a mistake based on a lie, without recantation, can be rectified only through more involved investigation.[8]

    The government's third-string argument misses the mark too. The exclusionary rule has a few narrow exceptions based on a police officer's reasonable reliance on the mistake of a neutral third party.  <u>Leon</u>, 468 U.S. at 905-08 (magistrates); <u>Massachusetts v.</u>

_____

    [8] This point also further distinguishes the <u>Terry</u> stop cases. The mistakes in <u>Coplin</u> and <u>Fox</u>, as between person (police officer) and object (computer screen or license plate light), were incapable of being corrected until after the stop was effected.  That obstacle is specific to the traffic-stop context; if it exists in other contexts as well, the doorstep exchange in the present case is not one of them.

Sheppard, 468 U.S. 981, 990 (1984) (similar); Illinois v. Krull,
480 U.S. 340, 349 (1987) (legislators); Arizona v. Evans, 514 U.S.
1, 14 (1995) (court employees).  Beyond the fact that the present
case involves a warrantless entry, see United States v. Curzi, 867
F.2d 36, 44 (1st Cir. 1989) (observing that "this court has not
recognized a good-faith exception in respect to warrantless
searches"), not one of these recognized exceptions involves a
police officer's reasonable reliance on the mistake of police
personnel.[9]  The weight of authority holds that such an exception
would subvert the prime objective of the exclusionary rule: the
deterrence of police misconduct.  See, e.g., United States v.
Herrera, 444 F.3d 1238, 1249-54 (10th Cir. 2006) (holding that the
good faith exception is inapplicable "when the mistake resulting in
the Fourth Amendment violation is that of the officer conducting
the seizure and search, rather than a neutral third party not
engaged in the 'competitive endeavor of ferreting out crime.'")
(quoting Leon, 468 U.S. at 914); Hoay v. State, 71 S.W.3d 573, 577
(Ark. 2002) (same); People v. Willis, 46 P.3d 898, 912-13 (Cal.
2002) (same); Shadler v. State, 761 So.2d 279, 284-85 (Fla. 2000)
(same); see also 1 Wayne R. LaFave, Search and Seizure: A Treatise

---

[9] The Evans Court declined to address the issue.  Evans, 514
U.S. at 16 n.5.  Interestingly, so did the First Circuit in Coplin
when it discussed Fox.  See Coplin, 463 F.3d at 102 n.6 ("The fact
that here, unlike in Fox, the mistake emanated from a government
[i.e., police] record raises a potential concern under [Evans].  In
this case, however, any argument under Evans is waived.")
(citations omitted).

21

on the Fourth Amendment § 1.3(f) (4th ed. 2004) (observing that Leon does "not allow law enforcement authorities to rely on an error of their own making"); 2 Id. § 3.5(d) ("the Evans rationale would seem inapplicable whenever the mistake was instead attributable to the law enforcement agency"); cf. Groh v. Ramirez, 540 U.S. 551, 564 (2004) (stating, in the context of qualified immunity, that "because petitioner [police officer] prepared the invalid warrant, he may not argue that he reasonably relied on the Magistrate's assurance that the warrant contained an adequate description of the things to be seized"). But see United States v. De Leon-Reyna, 930 F.2d 396, 401 (5th Cir. 1991) (en banc) (applying good faith exception to a police officer's mistake of fact in a Terry stop). Where, as here, police officers themselves are responsible for the mistake (as opposed to police functionaries), the application of the rule is more efficacious still.

But ignoring these deficiencies, and assuming without finding that Swierk and Mitchell simply misheard Antone say "come on" (when he really said "hold on"), the Court finds that an objectively reasonable police officer would not have believed that Antone consented to the entry of his home. As previously discussed, Det. Swierk asked Antone whether he would come to the police station, and Antone said that he would. To a reasonable person, Antone's unsolicited statement, "come on," would have been a puzzling follow

up to Det. Swierk's introduction and question.  Cf. Marshall, 348
F.3d at 286-88 (holding that the challenged item was within the
scope of the search because it reasonably fell within the expressed
object of the search, even though it turned out to be the
defendant's personal property).  The statement that the detectives
thought they heard is at best ambiguous, and nearly nonsensical in
light of the immediately preceding exchange.  Although Antone's
subsequent conduct concededly makes this a closer call,[10] a
reasonable police officer would have been especially cautious in
obtaining clear consent from an individual with impaired speech who
makes a nonsensical, non-responsive statement in answer to the
officer's request.  Cf. United States v. Cedano-Medina, 366 F.3d
682, 685-88 (8th Cir. 2004) (finding voluntary consent in spite of
a language barrier and the defendant's varying answers to whether
police could search his truck in part because the English-speaking
police officer asked the Spanish-speaking defendant repeatedly
until he was satisfied that the defendant had consented).  In this
unique situation, Swierk or Mitchell clearly should have confirmed
their belief that Antone had consented to the entry of his home.
Cf. United States v. Waller, 426 F.3d 838, 847-49 (6th Cir. 2005)
(holding, in the context of third-party consent, that the lack of
an expressed interest in the items searched, in conjunction with

---

[10] Although it may have been an oversight, defense counsel did
not solicit testimony from Antone about whether he opened the door
further as he retreated into his apartment, nor did Antone
otherwise rebut that aspect of the detectives' testimony.

the purpose of the police officer's presence, created an ambiguous situation, and that, under Rodriquez, the officer should have inquired further); United States v. Whitfield, 939 F.2d 1071, 1074 (D.C. Cir. 1991) (holding that the agent's superficial and cursory questioning of the consenting party did not disclose sufficient information for the agent reasonably to believe that she had common authority over the premises, and that further inquiry was required under Rodriguez). Moreover, as noted above, there was no exigency here that would have made a brief inquiry (perhaps only a single question) uneconomical or unsafe. See supra note 2.

Under the totality of the circumstances, the entry was unlawful. As a consequence, the cocaine Det. Mitchell seized from the living room, even if it was in plain view, must be suppressed.[11] See Segura v. United States, 468 U.S. 796, 812 (1984).

C.   Attenuation of the Taint

Where, as here, a search following an illegal entry is premised upon the consent of the defendant, the question becomes whether the tangible and testimonial evidence subsequently obtained is justified on the basis of that consent or is indelibly tainted by the initial illegal entry. An inquiring court must determine whether consent "has been come at by exploitation of that

---

[11] The government concedes that the inevitable discovery doctrine would not apply if the entry were unlawful because there is no evidence that the Newport police would have sought a warrant without the knowledge gained from the entry. See United States v. Dessesaure, 429 F.3d 359, 369 (1st Cir. 2005).

illegality or instead by means sufficiently distinguishable to be purged of the primary taint." Wong Sun v. United States, 371 U.S. 471, 488 (1963) (citation omitted) (holding that statements obtained following an illegal arrest are no less tainted than is physical evidence obtained after the same); United States v. Robeles-Ortega, 348 F.3d 679, 681 (7th Cir. 2003) (applying Wong Sun to suppress evidence from a search based on consent after an unlawful entry); see United States v. Paradis, 351 F.3d 21, 33 n.15 (1st Cir. 2003) (analogizing Brown and its progeny to claims that the defendant's statements were elicited as a result of an illegal search). Relevant factors include "[t]he temporal proximity" of the entry and the consent, "the presence of intervening circumstances," and "the purpose and flagrancy of the official misconduct." Brown v. Illinois, 422 U.S. 590, 603-04 (1975) (citations and footnotes omitted); see also United States v. Ayres, 725 F.2d 806, 810-11 (1st Cir. 1984). Observance of Miranda is an "important factor" as well, but "Miranda warnings, alone and per se, cannot always . . . break, for Fourth Amendment purposes, the causal connection between the illegality and the [consent]." Brown, 422 U.S. at 603 (emphasis in original); see also Paradis, 351 F.3d at 34. If the government cannot point to "an act of free will [sufficient] to purge the primary taint of the unlawful invasion," Wong Sun, 371 U.S. at 486, the evidence must be suppressed. Kaupp v. Texas, 538 U.S. 626, 633 (2003).

To satisfy its burden, the government observes that Antone was read and then waived his <u>Miranda</u> rights, and, also, that he signed a consent form that advised him of his right to refuse consent. According to the government, signing a consent form itself constitutes an "intervening act" sufficient to dissipate the taint, if any, remaining from two hours of introspective confinement. Further, rehashing an earlier argument, the government contends that there is no evidence of flagrant police misconduct that would justify the harsh remedy of exclusion in this case.

A review of the <u>Brown</u> factors leads the Court to conclude that, on balance, the unlawful entry inexpiably influenced Antone's written consent at the police station, and that the government has failed to satisfy its burden to prove attenuation.

The proximity of Antone's interrogation hurts rather than helps the government's position. Although the case law is concededly anecdotal in this regard, a span of about two hours is, in this writer's estimate, insufficiently remote where, as here, that time is spent entirely in police custody. <u>See</u>, <u>e.g.</u>, <u>Taylor v. Alabama</u>, 457 U.S. 687, 691 (1982) (six hours in police custody insufficient to purge taint); <u>Dunaway v. New York</u>, 442 U.S. 200, 218-19 (1979) (less than two hours insufficient); <u>Brown</u>, 422 U.S. at 604 (same); <u>United States v. Torres</u>, 274 F. Supp. 2d 146, 159 (D.R.I. 2003) (finding that statements made at police headquarters three or four hours after illegal search were not sufficiently

26

attenuated even though the defendant received Miranda warnings);
see also United States v. George, 883 F.2d 1407, 1416 (9th Cir.
1989) ("As best we are aware, no court has weighed the first factor
against a defendant when his inculpatory statement followed illegal
police conduct by only a few hours.").

With respect to the next factor, the continuum of events that
began with Det. Swierk's unlawful entry proceeded uninterrupted
through at least the point at which Antone gave written consent.
The fact that Antone signed a consent form after Det. Mitchell had
already discovered cocaine in the living room — cocaine that Antone
admitted was his — does not break this causal chain.  In Brown, the
Supreme Court noted that the defendant's previous confession during
the course of his illegal detention, believed incorrectly by him to
be admissible, "bolstered the pressures for him to give the second
[confession], or at least vitiated any incentive on his part to
avoid self-incrimination."  Brown, 422 U.S. at 605 n.12.  As in
Brown, the detectives crossed the Rubicon once Det. Mitchell
spotted and Antone confessed to that cocaine.  United States v.
Santa, 236 F.3d 662, 678 (11th Cir. 2000) (analogizing Brown, and
holding that signing a consent form is not an intervening act if
drugs were found and admitted to earlier); see Robeles-Ortega, 348
F.3d at 684 (similar); United States v. Maez, 872 F.2d 1444, 1457
(10th Cir. 1989) (similar); see also United States v. Washington,
387 F.3d 1060, 1074 (9th Cir. 2004) (signing consent form in and of

27

itself cannot constitute an intervening act); cf. United States v. Oguns, 921 F.2d 442, 447 (2d Cir. 1990) (signing consent form was an intervening act sufficient to dissipate the taint associated with illegal entry in part because agents did not seize any evidence until after the defendant consented to the search).

At first glance, the final factor — purposeful and flagrant police misconduct — would seem to militate against suppression in this case.   Swierk and Mitchell clearly believed that Antone consented to the entry, and there is no evidence of threatening or abusive tactics of the type that strongly favored suppression in Brown, 422 U.S. at 605 ("The manner in which [the defendant's] arrest was affected gives the appearance of having been calculated to cause surprise, fright, and confusion.").   But closer examination places this factor in Antone's corner as well.  Barring intervening acts of free will, see Rawlings v. Kentucky, 448 U.S. 98, 108-09 (1980), subsequent decisions have rejected attempts to distinguish Brown on the grounds that police behaved respectfully, as Swierk and Mitchell appear to have done here.  See Taylor, 457 U.S. at 691; Dunaway, 442 U.S. at 218-19; United States v. Shaw, 464 F.3d 615, 630-31 (6th Cir. 2006); Washington, 387 F.3d at 1075-77; Reed, 349 F.3d at 464-66; United States v. Perez-Esparza, 609 F.2d 1284, 1291 (9th Cir. 1980) ("The Court in Dunaway gave short shrift to the "purpose and flagrancy" factor emphasized in Brown."). But see Dunaway, 442 U.S. at 227 (Rehnquist, J.,

dissenting) (objurgating that "the police conduct in this case was in no manner as flagrant as that of the police in <u>Brown</u>").

Furthermore, under the exclusionary rule, to which this factor is inexorably tied, <u>United States v. Reed</u>, 349 F.3d 457, 464-65 (7th Cir. 2003) (observing that purposefulness factor "is considered the most important because it is tied directly to the rationale underlying the exclusionary rule, deterrence of police misconduct"), the proper measure of good faith is an objective rather than a subjective one.  <u>See Dunaway</u>, 442 U.S. at 220-21 (Stevens, J., concurring) (cautioning that, because suppression implicates a broad societal interest in effective law enforcement, "exclusionary rules should embody objective criteria rather than subjective considerations"); <u>cf. United States v. Ricciardelli</u>, 998 F.2d 8, 15 (1st Cir. 1993) (remarking, in the context of the good faith exception to the warrant requirement, that "<u>Leon</u> requires not merely good faith, but objective good faith").  By all accounts, Swierk and Mitchell acted with no discernable opprobrium in dealing with Antone that would betray their long impeccable records with the Middletown Police Department.  However, when the police enter someone's home without having asked permission, when the purported grounds for the entry turns on a word or phrase, and when it is obvious that the alleged consent giver has a speech impairment, the police do not act in objective good faith if they enter without somehow confirming their authority to do so.  <u>Cf. Ricciardelli</u>, 998

29

F.2d at 17 n.10 (noting that "if a situation arises in which officers wrongly conclude that the triggering event needed to animate an anticipatory warrant has occurred, and proceed to execute a full search in the fact of this mistake, we would not review that mistake under Leon's good faith standard").   This failure displays the sort of "quality of purposefulness" condemned in Taylor, Dunaway, and Brown that the exclusionary rule is designed to deter.

Because observance of Miranda alone cannot break the causal chain stretching back to the unlawful entry, Brown, 422 U.S. at 603, the tangible and testimonial evidence obtained thereafter must be suppressed.   See Murray v. United States, 487 U.S. 533, 536-37 (1988).

III. Conclusion

For all the foregoing reasons, the Motion to Suppress is GRANTED.


It is so ordered.


_William E. Smith_
William E. Smith
United States District Judge

Date: 3/23/07